**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Stone & Kelso LLC, | No. CV-20-00160-TUC-JCH |
| Plaintiff, | **ORDER** |
| v. | |
| Allied Insurance Company of America, | |
| Defendant. | |

Plaintiff Stone & Kelso LLC ("Stone") alleges that Defendant Allied Insurance Company ("Allied") (1) breached Stone's fire-insurance contract by denying Stone's claim and (2) through Allied's investigation of the claim committed tortious bad faith claims handling. (Doc. 1-3.) Before the Court are Allied's Motion for Summary Judgment ("Motion 1") (Doc. 130), Stone's Motion for Partial Summary Judgment ("Motion 2") (Doc. 149), and Stone's Motion for Leave to Amend ("Motion 3") (Doc. 147). In Motion 1, Allied seeks summary judgment on the breach of contract claim by arguing that as a condition to coverage Stone was required to have and maintain a monitored fire alarm

system, and no such system ever existed. Allied also seeks summary judgment on the bad faith claim by arguing it adequately investigated the claim, and the additional legal research Plaintiff alleges Allied should have done would not have supported Plaintiff's legal argument. In Motion 2, Stone cross moves for partial summary judgment on the breach of contract claim by arguing that the policy's requirement that Stone maintain a monitored fire alarm is an unenforceable coverage exclusion under Arizona law. In Motion 3, Stone seeks to add class-action claims to its complaint. For the following reasons, the Court grants Allied's Motion 1, denies Stone's Motions 2 and 3, denies Allied's request for attorney's fees, and enters judgment for Allied.

**I. FACTS**

Stone is jointly owned by Amy Burns and Daniel Eftimoff. (Doc. 131 at ¶ 1; Doc. 150 at ¶ 1.) In 2012, Stone purchased a commercial property located at 2619 North Stone Avenue, Tucson, Arizona, 85705 (the "Property"). (Doc. 1-3 at ¶ 5; Doc. 150-6 at 24:5–13.) In August 2012, Burns emailed an agent seeking insurance on the Property. (Doc. 131-1 28:15–29:3, 41:1–16.) The agent sent a questionnaire to Burns that included a question asking if there was a centrally monitored fire alarm on the Property. (Doc. 131-1 28:15–29:3, 30:2–4.) Burns lived remotely, so she forwarded the email to Eftimoff to confirm some of the questions, including about the monitored fire alarm system. (Doc. 150-5 at 32–33.) Eftimoff believed that a monitored fire alarm system existed based on what the previous owner's son-in-law told him. (Doc. 131-1 at 18:6–14.) Eftimoff also alleges "personally observ[ing]" a fire alarm system on the Property in 2012 but did not see whether the system was connected to a central fire alarm station. (*Id.* at 19:2–23.) In any event, Stone's insurance application stated that the Property had a monitored fire alarm system. (Doc. 131-1 at 35:1–6, 89.)

Allied's Policy (the "Policy") contained a "Protective Safeguard Endorsement ["PSE"] Advisory Notice" at the beginning of the policy, which stated at the top that "This Notice does not form part of the contract. No coverage is provided by this Notice[.]" (Doc. 131-2 at 7.) The notice explained that the "policy is written with a [PSE]" that "provides

explicit instructions to preserve coverage." *Id.* Specifically, the PSE must be "in place, operational, and maintained in good working order at the building shown on the endorsement. Failure to comply with any of these conditions may result in loss of insurance coverage." *Id.* Another notice appearing on the page describing coverage at the Property reads:

> **PROTECTIVE SAFEGUARDS** This premise [sic] has Protective Safeguards identified by the symbols below. Insurance for fire . . . will be excluded if you do not notify us immediately if any of these safeguards are impaired. See PB0430 for a description of each symbol. APPLICABLE SYMBOLS: **P-2**

(Doc. 131-2 at 12.) PB0430 is a form titled "Protective Safeguards" appearing after the coverage section in a section titled "Forms and Endorsements." (Doc. 131-2 at 19.) The "Protective Safeguards" form has two relevant components. The first is Section A of the form's first page, which reads: "**Condition.** As a condition of this insurance, you are required to maintain the applicable protective services or devices denoted by [symbols including the "P-2" referenced above.]" (Doc. 131-2 at 91.) On the next page, the symbol "P-2" is defined as an "Automatic Fire Alarm, protecting the entire building, that is: (a) Connected to a central station; or (b) Reporting to a public or private fire alarm station." (Doc. 131-2 at 91.) The second relevant component of the "Protective Safeguards" form is Section B of the form's first page, which reads: "**Exclusion.** Under Section B. EXCLUSIONS, the following exclusions are added: . . . We will not pay for loss or damages caused by or resulting from fire if, prior to the fire, you: a. Knew or should have known of any suspension or impairment in [the "P-2" protective safeguard] and failed to notify us of that fact; or b. Failed to maintain [the "P-2" protective safeguard] over which you have control, in complete working order[.]" (Doc. 150 at 10–11; Doc. 131-2 at 91.) By renewing the Policy, Stone continued to represent its compliance with the PSE. *See* Doc. 131-2 at 7 ("Note that acceptance of the policy, in the payment of premium, constitutes the insured's understanding and acknowledgement of the risk of loss of insurance at the scheduled building if the protective safeguard is not maintained.")

On January 22, 2018, Stone leased the Property to Chuck Blain and Zach Blain, dba Glow Zone Mini Golf, LLC ("Tenants"). (Doc. 150-2 43:7–44:1.) The lease did not include any language pertaining to installing or maintaining a monitored fire alarm system. (Doc. 150-5 at 67–90.) Eftimoff testified that when Tenants were remodeling the Property, Eftimoff saw a panel and cameras and asked, "[W]ow, you got a brand new fire and alarm system?" To which a Tenant replied, "Yeah." (Doc. 150 at ¶ 23; Doc. 150-2 115–16.) But Eftimoff also testified that Stone never tested to determine if it was a monitored fire alarm system, or follow up with Tenants to verify there was a monitored fire alarm system. (Doc. 150-2 at 39:16–40:9, 101.) And Stone never paid for any bill for central monitoring of a fire alarm service. (Doc. 131 at ¶ 25; Doc. 150 at ¶ 25.) At some point, relations between Tenants and Stone soured. Tenants changed the Property's locks and denied Stone access to conduct inspections. (Doc. 150 at 12.) In October, 2018, Tenants obtained a preliminary injunction prohibiting Stone from accessing the Property. (*Id.*; Doc. 150-2 at 160–62.) In September 2019, Stone filed a lawsuit to evict Tenants from the Property. (Doc. 131 at ¶ 29, Doc. 150 at ¶ 29.)

On November 12, 2019, either just after or as Tenants moved out, a fire broke out at the Property. (Doc. 131 at ¶ 30; Doc. 150 at 12.) Stone timely submitted a claim to Allied regarding the loss. On November 15, 2019, Allied hired Joe Sesniak, a fire origin-and-cause expert, to investigate the fire's circumstances. (Doc. 131 at ¶ 31; Doc. 150 at ¶ 31.) On November 19, 2019, Sesniak reported that there was no fire alarm, no wires in the telephone room alarm box, no fire detectors at the Property, and no alarm pull. (Doc. 131 at ¶ 32; Doc. 150 at ¶ 32.) On November 21, 2019, Allied's adjuster James Boles inspected the Property with property manager Phillip Fileccia. (Doc. 131 at ¶ 33; Doc. 150 at ¶ 33.) Boles did not see any evidence of a fire alarm, and Fileccia stated that he was not aware of any specific fire alarm on the property. *Id.* Allied then hired David Komm of Auspurger Komm Engineering, Inc., to inspect the Property for the existence of a monitored fire alarm system. (Doc. 131 at ¶ 34; Doc. 150 at ¶ 34.) In a January 8, 2020 report, Komm stated that he saw no smoke alarms, carbon monoxide alarms, wireless sensors, fire horn, klaxon, or

anything interior or exterior indicating a fire alarm system. (Doc. 131 at ¶ 34; Doc. 150 at ¶ 34.) He did note that there was a control unit at the Property "suitable" for fire controls, but "all leads were disconnected or simply cut." (Doc. 150 at 13–14; Doc. 131 at ¶ 34.) Komm concluded with "a reasonable degree of engineering certainty" there was no fire alarm system in place at the Property. *Id.* Eftimoff also visited the Property after the fire and reported that the panel he had seen previously was ripped out and missing, along with the cameras and wiring. (Doc. 150 at ¶ 32.)

On February 18, 2020, Allied denied Stone's insurance claim for damages sustained by the fire based on the Policy language stating that coverage would not exist if the insured failed to maintain a monitored fire alarm system at the Property. (Doc. 131 at ¶ 36; Doc. 150 at ¶ 36.)

On March 27, 2020, Stone filed its Complaint against Allied in the Pima County Superior Court. (Doc. 1-3.) In it, Stone alleges breach of insurance contract (Count #1); breach of implied duty of good faith and fair dealing, and tortious bad faith claims handling (Count #2). (*Id.*) On April 14, 2020, Allied filed its Notice of Removal. (Doc. 1.) On February 4, 2022, Allied filed Motion 1, and on March 15, 2022, Stone filed Motion 2 and Motion 3. (Doc. 130; Doc. 149; Doc. 147.)

**II. SUMMARY JUDGMENT STANDARD**

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not

produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson*, 477 U.S. at 248, 250; *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288–89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); see Fed. R. Civ. P. 56(c)(1). The evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. But if the non-movant identifies "evidence [that] is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (citations omitted); *see also Nilsson v. City of Mesa*, 503 F.3d 947, 952 n.2 (9th Cir. 2007) ("a conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact").

**III. ANALYSIS**

    **A. The Material Facts are Undisputed; there was no Monitored Fire Alarm**

Allied seeks summary judgment on Stone's breach of contract claim by arguing Stone did not have a monitored fire alarm system as the Policy requires. (Doc. 130 5:13–14.) Allied points to its investigations finding no evidence of a monitored fire alarm and to the numerous warnings in the PSE alerting insureds to the risk of loss of coverage absent a monitored fire alarm system. (Doc. 130 5:14–22.) Allied has met its initial responsibility on this basis, and the burden shifts to Stone to produce evidence that a reasonable jury could return a verdict in Stone's favor.

Even viewing Stone's evidence in the most favorable light, it does not create a

genuine issue of material fact for a jury whether a monitored fire alarm system existed at the Property. At oral argument, Stone conceded this point. (Trans. at 12:21–23.) Thus, the material facts are not in dispute and the breach of contract claim turns on a legal issue: is Allied's PSE requiring a monitored fire alarm enforceable (or not) under Arizona law?

### B. Allied's PSE Is Enforceable Under Arizona Law

Stone argues that Allied's PSE violates Arizona law by conflicting with the Arizona Standard Fire Policy.[1] (Doc. 149 4:23–24.) Stone's argument raises an issue of first impression for Arizona. Arizona Revised Statute § 20-1503(A) provides:

> No policy of fire insurance covering property located in this state shall be made, issued or delivered unless it conforms as to all provisions and the sequence thereof with the basic policy commonly known as the New York standard fire policy, edition of 1943. Such policy is designated as the Arizona standard fire policy.

The Arizona Supreme Court colorfully described Arizona's reasons for adopting the New York standard policy in a 1925 case:

> The whole history of fire insurance legislation shows a ceaseless struggle on the part of the companies to limit their liability, as expressed on the face of the policy, and as generally understood by the insured, through the use of changing conditions on the back of the policy, and in so-called 'riders' attached thereto, frequently phrased in language whose legal meaning is unintelligible to even the well-educated man, and an equally determined effort by the different Legislatures to hold all contracts of fire insurance to fixed forms, so that, when their legal effect was once established, the insured could rely upon there being no new so-called 'jokers' introduced into his policy, whether by rider or otherwise. The state of New York having, for obvious reasons, had more experience with fire insurance, and worked out a more complete scheme of remedial legislation than any other commonwealth, it was but natural many of the younger and smaller states, and among them Arizona, should have relied on its legislation as a trustworthy guide for them.

*Scot. Union & Nat'l Ins. Co. v. Phoenix Title & Tr. Co.*, 28 Ariz. 22, 30 (1925).

The New York standard fire policy requires insurers to insure against "all direct loss

---

[1] Arizona law applies because this dispute arose in Arizona, and the Court sits in diversity jurisdiction. *See, e.g.*, *Allstate Ins. Co. v. Hughes*, 358 F.3d 1089, 1094 (9th Cir. 2003).

- 7 -

by fire . . ., except as hereinafter provided." N.Y. Ins. Law § 3404(e) (McKinney) (emphasis omitted).[2] The New York standard policy thereafter lists several exceptions, exclusions, and conditions that void, exempt, suspend, or restrict coverage. N.Y. Ins. Law § 3404(e) 2:1–46 (McKinney). For example, the policy is void if "the insured has willfully concealed or misrepresented any material fact or circumstance." N.Y. Ins. Law § 3404(e) 2:1–5 (McKinney). The policy excludes "loss by fire or other perils . . . caused, directly or indirectly, by: [enemy attack, invasion, insurrection, rebellion, revolution, civil war, etc.]." N.Y. Ins. Law § 3404(e) 2:11–27 (McKinney). The policy suspends or restricts coverage "[u]nless otherwise provided in writing added hereto" for fire caused by arson, or fire that occurs while the building is vacant for more than 60 days. N.Y. Ins. Law § 3404(e) 2:28–35 (McKinney). Arizona adds an exclusion for loss by fire caused by terrorism to the New York list of limitations. A.R.S. § 20-1503(B). Finally, the New York standard policy (and so too the Arizona standard policy) permits added provisions "not inconsistent with the provisions of this policy." N.Y. Ins. Law § 3404(e) 2:42–46 (McKinney). If a policy's provisions conflict with the standard policy, the standard policy provisions govern. *See Nangle v. Farmers Ins. Co. of Arizona*, 205 Ariz. 517, 522 (App. 2003). Stone asserts that Allied's PSE is inconsistent with Arizona's standard policy because it purports to add an exclusion restricting coverage for a "direct loss by fire." (Doc. 149 5:27–28.)

Stone urges the Court to adopt a bright-line rule used in *Jin Zun Zou v. American Modern Home Ins. Co.*, 86 F.Supp.3d 1050 (D. Minn. 2015). There, a basement-bedroom fire caused extensive smoke damage to the rest of insured Jin Zun Zou's home. *Id.* at 1052. The insurer American Modern denied Jin Zun Zou's claim because the policy included a PSE requiring policy holders to maintain operational smoke detectors. *Id.* In fact, Jin Zun Zou did maintain smoke detectors that worked as designed to alert the occupants to the fire, but American Modern still denied the claim because it found additional non-functional

---

[2] For convenience, the Court cites to the modern statute. The 1943 edition is identical. *Compare* N.Y. Ins. Law § 3404 et seq., *with* William Edward Baldwin, New York Insurance Law, Annotated 41–42 (Banks-Baldwin Law Publishing Co., 34th ed. Supp. 1948).

smoke detectors in a closet. *Id.* The district court ruled for Jin Zun Zou, noting the absurdity of denying a claim where functioning smoke detectors were present because additional non-functioning smoke detectors were stored in the house. *Id.* at 1054. As a secondary reason for ruling for Jin Zun Zou, the court found that American Modern's PSE was also unenforceable because the Minnesota standard fire policy permitted some exclusions (for sprinklers) but not others (such as for smoke detectors). *Id.* at 1055. Stone seizes on this portion of the Minnesota decision, urging the Court similarly to adopt a bright-line rule and reject any provisions not found in the 165 lines of the New York standard policy that might be used to deny coverage.

Stone is effectively relying on the negative-implication canon of interpretation. *See* Scalia & Garner, Reading Law: An Interpretation of Legal Texts (2012), at 107 ("The expression of one thing implies the exclusion of others (*expressio unius est exclusio alterius*)."). Stone's argument is essentially this: (1) the Arizona legislature explicitly adopted the New York standard fire policy; (2) the New York policy calls out several permitted exceptions, exclusions, and conditions; (3) PSEs are not among the listed exceptions, exclusions, and conditions in the New York policy; therefore, (4) Arizona's legislature chose to exclude any exclusions not listed, including PSEs, when it adopted the New York standard policy. (*See* Doc. 149 at 9:24–26.) Despite its intuitive appeal, this argument overlooks other important interpretive canons, the plain language of the policy itself, and available Arizona and New York precedent. *See* Scalia & Garner, at 59 ("No canon of interpretation is absolute. Each may be overcome by the strength of differing principles that point in other directions.").

First, Stone's argument fails to construe the text as a whole. Scalia & Garner, at 167. The text at issue is not merely the isolated language of the Arizona statute, or even just the language of the 1943 edition of the New York standard policy. *See Scottish Union,* 22 Ariz. at 29–30 ("The question then arises as to what was included in the 'New York standard' policy when our Legislature adopted it in 1913. There can be no doubt, from the wording of [the statute], that the Legislature intended to follow the rules adopted by the state of New

- 9 -

York in all respects, so far as the form of policy was concerned."). Arizona acknowledged this holistic view again in 1927, reviewing a similar fire-insurance provision to Allied's PSE. *See Queen Ins. Co. v. Watson*, 31 Ariz. 340, 342–43 (1927). In *Watson*, the Court considered a "clear-space clause" requiring the insured to maintain a clear space of not less than 100 feet between stored cotton and any cotton gin, mill, or other building. *Id.* at 343. The Court agreed with the trial court that the clear-space clause was invalid because Arizona required fire-insurance policies to conform with the New York standard form as it was in 1913, when the Arizona adopted it, and in 1913 the clear-space clause had not been adopted by New York as a standard fire policy rider. *Id.* Here, the Court faces a similar issue with one change: the Arizona statute now specifies the 1943 version of the New York statute. The question then becomes whether in or before 1943 PSEs like Allied's were permitted as a matter of standard New York fire-policy law.

New York insurance law before 1943 comfortably permitted endorsements like Allied's PSE as "warranties," and continues to do so today. In 1939, for example, New York insurance law defined a "Warranty" as:

> any provision of an insurance contract which has the effect of requiring, as a condition precedent of the taking effect of such contract or as a condition precedent of the insurer's liability thereunder, the existence of a fact which tends to diminish, or the non-existence of a fact which tends to increase, the risk of the occurrence of any loss, damage, or injury within the coverage of the contract.

Insurance Law of the State of New York, Laws of 1939 136–37 (§ 150) (Paul R. Taylor, ed., Albany Williams Press, Inc. 1953). That definition is still good New York law today and squarely encompasses Allied's PSE because a monitored fire alarm system tends to diminish the risk of loss from fire. *See* N.Y. Ins. Law § 3106 (McKinney) (2022) (identical language). Furthermore, several recent New York cases have relied on that warranty definition to permit similar PSEs. *See Si Meat Vill., Inc. v. Amguard Ins. Co.*, 208 F. Supp. 3d 490, 492 (E.D.N.Y. 2016) (noting that under New York law, a PSE is a warranty (a type of condition), and granting summary judgment for the insurer where the insured had no fire

alarm despite representing it did on its insurance application) (citing *Triple Diamond Cafe, Inc. v. Those Certain Underwriters at Lloyd's London*, 124 A.D.3d 763, 765 (N.Y. App. Div. 2015) (affirming summary judgment for insurer where insured was required to have a fully operational central-station fire and burglar alarm but did not set the alarm on the day a burglary caused an all-consuming fire); *see also Anghel v. Utica Mut. Ins. Co.*, 127 A.D.3d 897, 899 (N.Y. Ct. App. 2015) (acknowledging that a PSE is a permissible "warranty" related to fire loss); 31 N.Y. Prac., New York Insurance Law § 16:54 (2021–2022 ed.) ("[New York] [f]ire insurance policies may require the insured to maintain fire-fighting apparatus, which requirement is usually regarded as a promissory warranty or condition subsequent that must be strictly complied with."). The Court is therefore persuaded that because PSEs do not impermissibly restrict New York's standard policy under New York law, they do not impermissibly restrict New York's standard policy under Arizona law. Viewing Arizona law as a whole—including 1943 New York insurance law defining warranties and subsequent case law relying on it—Stone's argument that PSEs are invalid by negative implication fails.

Second, Stone's argument does not adequately consider the standard policy as a whole, which contemplates "added provisions not inconsistent" with the rest of the policy. N.Y. Ins. Law § 3404(e) 2:42–46 (McKinney). Again, New York case law is particularly persuasive here. *See Stankova v. Metropolitan Property & Casualty Insurance Co.*, 788 F.3d 1012, 1015 (9th Cir. 2015) (looking to New York law and treatises for guidance to establish the meaning of a term in an Arizona standard fire policy); *Nangle v. Farmers Ins. Co. of Arizona*, 205 Ariz. 517, 522 (App. 2003) (looking to New York's interpretation of the standard policy for guidance). As in Arizona, in New York "[n]o policy or contract of fire insurance shall be made . . . unless it shall conform as to all provisions, stipulations, agreements and conditions with [the New York standard policy]." New York Ins. Law § 3404(b)(1) (substantially similar language to A.R.S. § 20-1503(A)). Arizona and New York fire-policy law are also similar because both require fire policies that do not conflict with and are "no less restrictive" than New York's standard policy. *Compare Sciranko v.*

*Fid. & Guar. Life Ins. Co.*, 503 F. Supp. 2d 1293, 1313–14 (D. Ariz. 2007) ("To the extent that original policy terms conflict with statutory terms, the trick is to identify the terms that provide the most generous coverage. Statutory language will govern if contrary privately contracted language is less favorable to the insured."), *with Quaker Hills, LLC v. Pac. Indem. Co.*, 728 F.3d 171, 180 (2d Cir. 2013) ("[Under New York law,] while an insurer is free to deviate from the New York Standard Form by providing terms that are *more* favorable . . . a fire insurance policy must include terms and provisions *no less* favorable to the insured than those contained in the standard fire policy." (emphasis added)). In short, in both Arizona and New York a provision is "consistent" with the standard policy if it grants equal or broader coverage than the standard policy, and "inconsistent" if it grants narrower coverage. Stone characterizes Allied's PSE as providing narrower coverage because it is an "exclusion restricting coverage for a 'direct loss by fire.'" (*See* Doc. 149 at 5:26–28.)

But a *condition* is different from an *exclusion*, despite their somewhat similar effect, and Allied's PSE is clearly the former. A condition is different from an exclusion because "the breach of [a condition will] terminate or suspend insurance while the effect of [an exclusion] is to declare that there never was insurance with respect to the included risk." 6 Couch on Ins. § 81:19. Put differently, a condition is an act or event that creates a reciprocal duty to perform a promise, *see* Rst. (2d) of Contracts § 224 (1981), but an exclusion is an explicit recognition of something not promised. Although conditions are generally disfavored because they tend to work a forfeiture, they may be created by "contractual language demonstrating the parties' unequivocal intent to create the condition." *Angle v. Mario Builders, Inc.*, 128 Ariz. 396 (1981) (citing *L. Harvey Concrete, Inc. v. Agro. Constr. & Supply Co.*, 189 Ariz. 178, 182 (App. 1997) (internal quotations omitted)).

Here, Allied's PSE appears in a notice at the front of the contract that explicitly states "This Notice does not form part of the insurance contract. No coverage is provided by this Notice, nor can it be construed to replace any provisions of the policy (including its endorsements)." (Doc. 131-2 at 7.) The Notice further states, "Note that acceptance of the

policy, in the payment of premium, constitutes the insured's understanding and acknowledgment of the risk of loss of insurance at the scheduled building if the protective safeguard is not maintained. . . . The condition in this endorsement applies to all coverages provided by the insurance . . . ." *Id.* Further, in the "Protective Safeguards" description later in the policy, another "Notice" states, "As a condition of this insurance, you are required to maintain [an "Automatic Fire Alarm, protecting the entire building, that is: a. Connected to a central station; or b. Reporting to a public or private fire alarm station."]. (Doc. 131-2 at 91–92.) Although one of the forms refers to the protective safeguard both as an "exclusion" and a "condition," the balance tips heavily toward the description of it as a "condition." *See* Doc. 131-2 at 91. The Court finds that this contractual language demonstrates an intent to create a condition—not an exclusion—to coverage.[3]

Furthermore, a condition requiring a monitored fire alarm system is not "inconsistent" with a standard policy ensuring "all direct loss from fire." Stone relies most heavily on *Stankova* to support its position. 788 F.3d at 1012. There, a massive wildfire in Northern Arizona destroyed insured Stankova's detached garage and all vegetation on a nearby hillside. *Id.* at 1013. One month later, a mudslide and runoff water from the hillside destroyed Stankova's house. *Id.* Stankova's insurance provider Metropolitan agreed to cover the loss of the garage but not the house because Stankova's policy covered "direct" loss caused by fire but excluded loss caused by water damage or mudslide. *Id.* at 1013–1014. The district court concluded the fire could not, as a matter of law, have "directly" caused the mudslide, but the Ninth Circuit reversed and remanded to determine causation. *Id.* at 1013. At the end of its opinion, the court considered Metropolitan's "anti-concurrent causation" provision (ACC), which purported to limit coverage where an excluded cause

---

[3] At oral argument, Allied argued that the requirement to have a monitored fire alarm is a condition, and the requirement to maintain the monitored fire alarm is an exclusion. (Trans. at 7:12–18.) Allied distinguished between the two by reference to the contract itself, where it discusses the former in a section titled "Conditions" and the latter in a section titled "Exclusions." *Id.*; *see also* Doc. 131-2 at 91. Here, the legal issue before the Court is whether the requirement to *have* a monitored fire-alarm conflicts with Arizona law, and that is the issue the Court decides.

(mudslide) was *a* cause of the loss even if it was not the *only* cause. *Id.* at 1017. The court reasoned that the ACC was unenforceable because it conflicted with Arizona's statutorily mandated standard fire insurance policy, which insures against *all* direct loss by fire. *Id.* Stone argues that Allied's PSE is similar to the ACC in *Stankova*, and similarly unenforceable. Doc. 149 5:27–28, 6:1–7.

But *Stankova* is distinguishable because its ruling was primarily about causation: whether the fire "directly caused" the damage to Stankova's house. The ACC provision also involved causation: it attempted to exclude damage directly caused by fire if the damage was also caused by a policy exclusion like mudslide, which is inconsistent with a standard policy requiring coverage of all direct damage directly caused by fire. By contrast, Allied's PSE says nothing about causation; whatever a fire's cause, and however it directly causes a loss, Allied's PSE states only what the insured has promised to do—have a monitored fire alarm—to lower the risk of loss.[4]

Stone's other cases are not particularly helpful because they involve obvious inconsistencies between an issued policy and the standard policy. For example, Stone cites a Seventh Circuit case where a policy excluding fire caused by "any insured" conflicted with the Standard Fire Policy exclusion of fire caused by "the insured." (Doc. 149 at 8.) (citing *Streit v. Metropolitan Cas. Ins. Co.*, 863 F.3d 770, 773 (7th Cir. 2017). Similarly, Stone cites an Arizona case where the fire policy excluded asbestos removal costs even though they were a direct consequence of a fire, and an Illinois case where the fire policy excluded damage from fire caused by vandalism. (Doc. 149 at 8.) (citing *Lukes v. Am. Family Mut. Ins. Co.*, 455 F. Supp.2d 1010, 1014 (D. Ariz. 2006); *Lundquist v. Allstate Ins. Co.*, 314 Ill. App.3d 240 (2000)). But as with *Stankova*, these cases offer little guidance because Allied's PSE does not exclude coverage based on a cause or effect of fire. The PSE requires insureds to agree to reduce the fire risk by having a monitored fire alarm and, if they agree, Allied extends them full coverage for all direct loss caused by fire. Allied's PSE

---

[4] Stone argues that this feature makes Allied's PSE a "super-ACC" because it restricts coverage whatever the cause of the loss. (Doc. 149 at 6.) The situation is simpler than that. The PSE's lack of causal language weakens rather than strengthens its analogy to the ACC.

therefore avoids *Stankova*'s reasoning and remains consistent with Arizona's standard policy.

Finally, the Court disagrees with Stone's assertion that the Court's decision here is contrary to public policy. Stone correctly notes that New York's standard fire policy was adopted in Arizona and elsewhere primarily to protect insureds from unexpected limitations. (Doc. 149 6:8–10.) Stone captures this "consumer protection principle" in a Minnesota decision stating that the Standard Fire Policy "was enacted to 'do away with the evils arising from the insertion in policies of conditions ingeniously worded which restricted the liability of the insurer and gave the insured less protection than he might naturally suppose he was getting under his contract.'" (*Id.* (citing *Watson v. United Servs. Auto. Ass'n*, 566 N.W.2d 683, 689 (Minn. 1997))). But the sensible concern that consumers might be tricked into purchasing inadequate coverage is not at play here, where the terms of Allied's PSE condition are written in plain language and posted conspicuously at the beginning and throughout the policy. Stone was not tricked or misled. (*See* Doc. 150-5 at 32–33.) Stone warns that permitting unscrupulous insurance companies to characterize every exclusion as a condition would "gut" Arizona's statute and render the standard policy "worthless." (Doc. 149 at 10:16; Doc. 167 at 2:3–4.) But Stone's warning is substantially weakened by the fact that the New York standard policy was not gutted in New York when New York began permitting PSEs as warranties.

### a. Stone's remaining arguments fail because they are premised on the existence of a monitored fire alarm system that did not exist.

Next, Stone marshals several arguments that even if the PSE is valid, there are questions of fact (1) whether Stone "believed" the safeguard was in place, (2) whether Stone knew or should have known of an "impairment" in the safeguard, and (3) whether Stone had control over the premises and failed to maintain the safeguard. (Doc. 149 at 11–14.) The Court need not address these disputes because they do not relate to material facts. The material fact is whether there was a monitored fire alarm system, and Stone conceded there was not. (Trans. at 12:21–23.) The requirement to have and maintain a monitored fire alarm system was unambiguous. *See* Doc. 131-9 at 91 ("You risk the loss of certain

insurance coverage at premises designated in the declarations if you fail to maintain any of the applicable protective safeguards"); Doc. 131-2 at 7 ("The scheduled protective safeguard(s) scheduled endorsement must be: in place; operational; and maintained in good working order at the building shown on the endorsement. Failure to comply with any of these conditions may result in loss of insurance coverage."); Doc. 150-5 at 32–33. The Allied PSE requires the fact of a monitored fire alarm system, not a belief in one.

### b. Allied did not waive its PSE by not refunding Stone's premiums because Allied was unaware the monitored fire alarm system did not exist when Allied issued Stone's policy.

Stone argues that Allied waived the PSE by not refunding Stone's premiums. But the cases Stone cites are inapposite because they deal largely with issues around insurance coverage of an event after the application is completed but before the policy is issued. *See, e.g.*, *McCollum v. Continental Cas. Co.*, 151 Ariz. 492, 494 (App. 1986). Another of Stone's cases cuts against Stone's position, showing that Arizona courts are comfortable directing a verdict for an insurer where a material misrepresentation on the application was not known to the insurer when the policy issued. *See Greber v. Equitable Life Assur. Soc.*, 43 Ariz. 1, 9–11 (1934). The waiver issue arises when an insurer knows of facts that would invalidate the policy but issues it anyway. *Id.* Here, Allied did not know that Stone's building did not have a monitored fire alarm system until after its investigations into the circumstances of the fire.

### B. Motion 1 Bad Faith Claim

An insurer "commits the tort of insurance bad faith when it 'intentionally denies, fails to process or pay a claim without a reasonable basis.'" *Fid. Nat'l Title Ins. Co. v. Osborn III Partners LLC*, 250 Ariz. 615, 628 (App. 2021), review granted (Aug. 23, 2022) (citing *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 196 Ariz. 234, 238 (2000) (en banc)). Where "the issue turns on questions of contract interpretation," it is a question of law for the Court to decide. *Id.* (affirming summary judgment where insurer reasonably relied on an exclusion and the operative facts were simple and not in dispute). A failure to investigate adequately is material if further investigation would have revealed relevant facts. *Aetna*

*Cas. & Sur. Co. v. Superior Ct. In & For Cnty. Of Maricopa*, 161 Ariz. 437, 440 (App. 1989).

### a. Allied's investigation created a reasonable basis for denying Stone's claim.

Stone argues that Allied's investigation lacked a reasonable basis because Allied did not investigate Stone's allegation that the PSE violated Arizona law. (Doc. 1-3 at 7–8; Doc. 149 at 16.) But even assuming that is true, Allied's investigation into Arizona law would not have revealed any binding authority holding PSE's invalid, and several persuasive New York cases holding PSEs valid under the New York standard policy.[5] Moreover, Allied's investigation as a whole was adequate and provided a reasonable basis for denying Stone's claim. The operative fact of whether Stone's building had a monitored fire alarm system was established beyond dispute by (1) Allied's adjuster, who inspected the building after the fire and saw no components of a monitored fire alarm system; (2) Allied's fire cause-and-origin expert, who saw no evidence of a monitored alarm; and (3) Allied's engineering expert, who also saw no evidence of a monitored alarm system.  (Doc. 131 at ¶¶ 31, 33, 34; Doc. 150 at ¶¶ 31, 33, 34.) Nor does Stone's insurance expert's report raise issues of material fact because the report either fails to allege shortcomings in Allied's investigation that would have revealed a monitored fire alarm system, *see, e.g.*, Doc. 131-6 at ¶¶ 36, 44, or alleges failures in Allied's investigation that are immaterial given the absence of evidence of a monitored fire alarm system. *See, e.g.*, Doc. 131-6 at ¶¶ 37, 41, 56. There is therefore no genuine dispute between Allied and Stone whether Allied's denial of Stone's claim was in bad faith, and Allied is entitled to summary judgment on the bad faith claim.

### b. Allied is entitled to summary judgment on punitive damages.

Stone argues that Stone is due punitive damages because Allied "consciously disregarded" the "Standard Fire Policy Issue." Where summary judgment is granted on a

---

[5] Because a legal investigation would not have revealed binding or clearly instructive authority, whether or not Allied undertook one is immaterial. In different circumstances, a failure to investigate the possibility of legal invalidity might raise issues of implied waiver of attorney-client privilege. *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Lee*, 199 Ariz. 52 (2000).

bad faith claim, it is also appropriate on an accompanying punitive damages claim. *Regal Homes, Inc. v. CNA Ins.*, 217 Ariz. 159, 171 (App. 2007). Summary judgment on a punitive damages claim is also appropriate "in the absence of facts sufficient to show by clear and convincing evidence that the defendant acted with the requisite evil mind." *Jones v. Metcalf*, 252 Ariz. 270 (App. 2021). An "evil mind" is demonstrated either by intending to injure the plaintiff, or consciously pursuing "a course of conduct knowing that it create[s] a substantial risk of serious harm to others." *Id.* (citing *Quintero v. Rogers*, 221 Ariz. 536, ¶ 17 (App. 2009)).

Here, the Court will grant summary judgment for Allied on Stone's bad faith claim, and so also grants summary judgment for Allied on Stone's punitive damages claim. The Court separately notes that Stone has presented no evidence suggesting that Allied acted with an evil mind in denying Stone's claim. Rather, Allied conducted a prompt and reasonable investigation into the fire, discovered that Stone lacked a monitored fire alarm system as required by Stone's policy, and, consistent with the policy's plain language, fairly denied the claim on that basis.

**C. Allied's request for attorneys' fees is denied.**

Allied seeks attorneys' fees under A.R.S. § 12-341.01 as the prevailing party in an action arising out of contract.  Allied argues it is entitled to attorneys' fees because Stone's claims "lack any merit," and had Stone's "Counsel been more objective, this litigation could have been avoided." (Doc. 158 at 11.) The Court has discretion whether to award attorneys' fees and looks to several factors when making that determination: (1) the merits of the claim or defense presented by the unsuccessful party; (2) whether the litigation could have been avoided or settled, rendering the successful party's efforts completely superfluous; (3) whether assessing fees against the unsuccessful party would cause an extreme hardship; (4) whether the successful party did not prevail with respect to all relief sought; and (5) the novelty of the legal question presented, and whether such claim or defense had previously been adjudicated in the jurisdiction. *Associated Indem. Corp. v. Warner*, 143 Ariz. 567, 570 (1985) (en banc).

Here, the core issue—the validity of Allied's PSE under Arizona law—is a novel one. There is no controlling case law on point. Both sides made cogent, credible arguments supported by persuasive case law. Stone has not stated whether awarding fees would cause it extreme hardship, but the Court recognizes that Stone has now been denied insurance coverage for a loss caused by fire, which results in an unexpected financial blow. The Court therefore exercises its discretion not to award Allied attorneys' fees.

**D. Stone's Motion 3 is denied as moot because Allied's Motion 1 is granted.**

In Motion 3, Stone seeks leave to file a Second Amended Complaint, adding class action claims against Allied on the theory that Allied's PSE is invalid under Arizona law. Because the Court grants Allied's Motion 1, Stone's Motion 3 is now moot. The Court therefore denies Stone's Motion 3 as moot.

**IV. ORDER**

For the reasons stated above,

**IT IS ORDERED GRANTING** Allied's Motion 1 (Doc. 130).

**IT IS FURTHER ORDERED DENYING** Allied's request for award of attorneys' fees.

**IT IS FURTHER ORDERED DENYING** Stone's Motion 2 (Doc. 149).

**IT IS FURTHER ORDERED DENYING** Motion 3 (Doc. 147). The Clerk of Court must enter judgment accordingly.

Dated this 27th day of September, 2022.

_____
Honorable John C. Hinderaker
United States District Judge